# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA <br> <u>ex rel.</u> BRYAN DINGUS | Civil Action No. |
| | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Plaintiff | |
| v. | **FILED UNDER SEAL PURSUANT TO** |
| ODYSSEY HEALTHCARE, INC. | **31 U.S.C. § 3730(b)(2)** |
| Defendant. | |

## OVERVIEW OF COMPLAINT

1.      This is a civil action brought by relator Bryan Dingus ("Relator") on his own behalf and on behalf of the United States of America ("United States") against Odyssey HealthCare, Inc. ("Defendant" or "Odyssey") under the *qui tam* provisions of the Civil False Claims Act, 31 U.S.C. § 3729, *et seq*. (the "False Claims Act" or "FCA"), to recover damages, civil penalties, and other relief owed to the United States and Relator.

2.      In connection with the receipt of reimbursement from the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), Defendant committed fraud against the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ccc and 42 C.F.R. Parts 400-1004, by (a) knowingly presenting, and causing to be presented to an officer and employee of the United States Government false and fraudulent claims for payment and approval; and (b) knowingly making, using, and causing to be made and used, false

records and statements to get false and fraudulent claims paid and approved by the Government, in violation of 31 U.S.C. §§ 3729(a)(1) and (2).

3.      In brief, Defendant, a private, for-profit hospice chain has defrauded the United States through a systemic pattern and practice of enrolling and re-certifying non-terminal patients, billing for continuous care when such care was neither reasonable nor necessary, providing inadequate services and other violations of the Medicare Conditions of Participation, engaging in conduct to circumvent the Medicare per patient cap amount and several violations of the anti-kickback law. Defendant's conduct has also violated the Corporate Integrity Agreement that it entered into with the United States dated July 6, 2006.

## PARTIES

4.      Relator, Bryan Dingus is a resident of the State of Virginia. He was employed by Defendant as the Executive Director of Defendant's Norfolk, Virginia hospice from March 2005, until he was terminated on November 18, 2008.

5.      Defendant, Odyssey HealthCare Inc. is a Delaware corporation with its principle place of business located at 717 North Harwood Street, Suite 1500. Dallas, Texas, 75201.

6.      Defendant is one of the largest providers of hospice care in the country in terms of both average daily patient census and number of locations.

7.      Defendant has approximately 130 Medicare-certified hospice locations in 30 states and an average daily census of more than 12,000 patients.

8.      Defendant operates all of its hospice programs through its operating subsidiaries. Odyssey's executive and administrative operations are centrally managed from Dallas, Texas. At Defendant's corporate headquarters in Dallas, Odyssey makes and implements company-wide

operating, financial, development, accounting, human resources, and legal decisions and policies. "Administrative functions such as human resources, payroll, employee benefits, training, reimbursement, finance, accounting, legal and information systems are handled at Defendant's centralized Support Center."

9.    Medicare and Medicaid comprise over 95% of Defendant's payor sources.

10.    As part of a previous *qui tam* settlement, Defendant entered into a CIA with the HHS/OIG. A copy of the Corporate Integrity Agreement is attached collectively as **Exhibit A**.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (Federal question), 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

12.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found, resides, and transacts business in the Eastern District of Wisconsin and because an act proscribed by 31 U.S.C. § 3729 occurred within this District. Defendant maintains a hospice office located at 10150 West National Avenue, Suite 200, West Allis, WI. Title 31, United States Code, Section 3732(a) further provides for nationwide service of process.

13.    Upon information and belief, there are no pending actions that would be deemed to be related to this action, and further, this Complaint is not based on the facts underlying any such pending action, within the meaning of the False Claims Act's first to file rule, 31 U.S.C. § 3730(b)(5).

14.    This action is not precluded by any provisions of the False Claims Act's jurisdiction

3

bar, 31 U.S.C. § 3730(e) *et seq.*

        a.     Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

        b.     Upon further information and belief, there has been no "public disclosure" of the matters alleged herein and this action is not "based upon" any such disclosure, within the meaning of 31 U.S.C. §3730(e)(4)(A).  Notwithstanding the foregoing, Relator is an "original source" of this information as defined by 31 U.S.C. §3730(e)(4)(B) of the False Claims Act, and as such, he is expressly excepted from its public disclosure bar.

15.     Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because Defendant can be found in and transacts business within this District.

## THE FEDERAL FALSE CLAIMS ACT

16.     The False Claims Act (FCA) was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

17.     The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes,

4

uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

18. The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time). Based on these provisions, *qui tam* plaintiff and relator seek through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

19. Although the precise amount of the loss from Defendant's misconduct alleged in this action cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the Defendants under the facts alleged in this Complaint amounts to millions of dollars.

20. The text of the False Claims Act provides, in pertinent part, that:

> (a) Any person who…(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government…a false or fraudulent claim for payment or approval; [and] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; …***is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person….(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information…(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless

5

disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## THE ANTI-KICKBACK STATUTE

21.     The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to over utilization or poor quality of care.

22.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes inducement of a physician to refer patients for services that will be reimbursed by a federal health care program.  The Statute ascribes liability to both sides of an impermissible kickback relationship.

23.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

6

24.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs. Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were the result of referrals tainted by kickbacks, are false claims and are not entitled to reimbursement.

25.     Providers who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

26.     Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency (ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

## MEDICARE

27.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefitting the elderly. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  See 42 U.S.C. § 426 et seq.  Part A of the Medicare Program, the Basic Plan of Hospital

7

Insurance, authorizes payment for institutional care, including hospice services. See 42 U.S.C. §§ 1395c-1395i-4.

28.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

29.  To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

**The Medicare Hospice Benefit**

30.  The Tax Equity and Fiscal Responsibility Act of 1982 created the Medicare hospice benefit for eligible beneficiaries under Medicare Part A. The goal of hospice care is to assist terminally ill beneficiaries to continue life with minimal disruption while supporting families throughout the process.

31.  The Medicare hospice benefit was designed to provide patients who have a terminal illness with comfort and pain relief, as well as emotional and spiritual support, generally in a home setting. By law, Medicare hospice services include nursing care, counseling, and home health aide services, as well as drugs and medical supplies.(42 U.S.C. § 1395x(dd)(1) (2000).) Hospice services are delivered by providers that operate as freestanding entities or are based in hospitals, home health agencies, or skilled nursing facilities.

32.  Upon a beneficiary's election of hospice care, the hospice provider assumes the responsibility for medical care related to the beneficiary's terminal illness and related conditions. This care is palliative, rather than curative. The beneficiary waives Medicare coverage for services

8

related to the treatment of the terminal condition or a related condition (42 CFR § 418.24.) but retains Medicare coverage for services to treat conditions unrelated to the terminal illness.

33.    Beneficiaries are entitled to receive hospice care for two 90-day periods and unlimited 60-day election periods.(42 CFR § 418.21.) The periods need not be consecutive.

34.    At the start of each period of care, a physician must certify that the beneficiary is terminally ill and has a life expectancy of 6 months or less. The attending physician and the hospice medical director are required to make the initial certification. The hospice medical director is required to make each subsequent recertification.(42 CFR § 418.22.)

35.    In addition to the election and certification requirement to be covered by Medicare: the services must be reasonable and necessary for the palliation or management of the terminal illness as well as related conditions; a plan of care must be established by a physician and an interdisciplinary group comprising a physician, a registered nurse, social worker, and a pastoral or other counselor; and the services must be consistent with the plan of care.(42 CFR § 418.200; 42 CFR § 418.24; 42 CFR § 418.58; 42 CFR § 418.68.)

36.    The Medicare hospice benefit has four levels of care and each level has an all-inclusive, prospectively determined daily rate. The rate is paid to the hospice for each day that a beneficiary is in hospice care, regardless of the amount of services furnished.  CMS publishes hospice payment rates annually to be used for each level of care, which rates are also adjusted based on the beneficiary's geographic location.  CMS developed four payment categories, with corresponding per diem payment rates to reflect variation in service intensity and the location of service (42 C.F.R. § 418.302(b)(1) – (4) (2003)).

9

a.     Routine Home Care: The routine home care rate is paid to the hospice for each day the beneficiary is under the care of the hospice and not receiving one of the other categories of care. Routine home care includes, but is not limited to, nursing and home health aide services. Routine home care can be provided in the home or other places of residence, such as a nursing facility.

b.     Continuous Home Care: Continuous home care is allowed only during periods of crisis in which a beneficiary requires continuous care to achieve palliation or management of acute medical symptoms. It is covered only as necessary to maintain the terminally ill beneficiary at home. The care must be predominantly nursing care. Continuous home care can be provided in the home or other places of residence, such as a nursing facility. The continuous home care rate is divided by 24 hours to determine an hourly rate. A minimum of eight hours must be provided.

c.     Respite Care: Respite care is short-term inpatient care provided to the beneficiary when necessary to relieve the beneficiary's caregiver(s). Respite care may be provided only on an occasional basis and is not reimbursed for more than 5 consecutive days. Inpatient care may be provided in a Medicare-certified or Medicaid-certified hospice inpatient facility, hospital, or skilled nursing facility.

d.     General Inpatient Care: General inpatient care is inpatient care for pain control and symptom management that cannot feasibly be provided in other settings. Inpatient care may be provided in a Medicare-certified or Medicaid-certified hospice inpatient facility, hospital, or skilled nursing facility.

37.     The specific services that a patient should receive are outlined in a plan of care, vary based on the type and intensity of the patient's symptoms and psychosocial needs and the needs of

the patient's caregiver, and may vary throughout the hospice stay as the patient's condition changes.

38.     Defendant's fraudulent scheme was implemented in part through its aggressive marketing plan. Defendant markets its hospice services primarily to physicians, nursing homes and other healthcare providers through Community Education Representatives ("CER") who work within Defendant's marketing department. Defendant's CERs' primary function was to bring in patients to the hospices and are required to meet a quota of anywhere between six to twelve admitted patients per month.

## INTRODUCTION TO ALLEGATIONS

39.     At all material times Defendant employed between 200-300 CERs who are supported by a centralized training and education department in our Support Center." CERs were given goal number of admissions to meet every month.  Once they exceeded 90% of their goal, representatives received bonuses based on reaching in excess of 90% of the goal that month.

40.     As such, some patients are admitted without even a recognizable terminal illness and are simply certified on amorphous basis such as "failure to thrive," or "debility unspecified," with scant or minimal documentation of a diagnosable, much less, terminal illness. Many of Defendant's patients are elderly who might require some type of elder care assistance, but who do not have a terminal illness and do not qualify for hospice care.

## FALSE CLAIMS ACT ALLEGATIONS
### Corporate Integrity Agreement

41.     Defendant's Corporate Integrity Agreement ("CIA") contains provisions specifically

11

designed to ensure Defendant's compliance with Medicare and Medicaid hospice eligibility requirements. Defendant submitted or caused to be submitted false claims in conjunction with its CIA.

42.     While Defendant has had a compliance plan in place, it failed to adhere to it. Worse, the  relationship between the CIA and the conduct at issue is direct: the CIA was the result of an agreement between the United States and the Defendant arising from the identical egregious conduct: that is, that Defendant has continued to falsely admit patients to hospice care who do not qualify for the benefit.

43.     For instance, upon information and belief, Defendant failed to report the results of internal audits which detailed substantial billing that did not meet the criteria for continuous care in 60% of the charts. In doing so, Defendant violated inter alia, the following sections of the CIA: Section III H.I.b (Reporting of Overpayments) (p.16) and also IV B.9. (Summary of Reportable Events as part of Annual Report p.22).

### Continuous Home Care

44.     Continuous care Medicare revenue was $32.86 per hour in 2008.  It has always been the highest reimbursement level of care that can be provided. Defendant submitted claims for continuous home care although that level of care was neither reasonable nor necessary.

45.     Medicare regulations provide:

> Continuous home care may be provided only during a period of crisis. A period of crisis is a period in which a patient requires continuous care which is primarily nursing care to achieve palliation or management of acute medical symptoms.

> The hospice must provide a minimum of eight hours of care during

12

a 24-hour day, which begins and ends at midnight. This care need not be continuous, e.g., four hours could be provided in the morning and another four hours in the evening. But a need for an aggregate of 8 hours of primarily nursing care is required.

Medicare Benefit Policy Manual, Chapter 9, 40.2.1 - "Coverage of Hospice Services under Hospital Insurance."

46.     At the January 2006 national meeting in Dallas, Defendant launched its continuous care initiative, sharing its expansion goals and mandating that executive directors, senior management and department heads would implement them.

47.     The initiative worked: Defendant's percentages increases in continuous care in terms of days of care is as follows:

2004 = 0.2%
2005 - 0.8%
2006 - 1.7%
2007 - 1.7%

48.     Yet, patient charts themselves across the country will reflect a lack of medical necessity for continuous care. Periodic internal audits clearly demonstrated that Defendant charts failed to support the necessary criteria for providing continuous care.

### Inadequate Patient Care

49.     Because payment for hospice services are primarily paid on a per diem basis, profit is directly related to the expenses incurred by the hospice, and thus there is incentive to minimize expenses. In order to minimize expenses, Defendant provided inadequate services and/or discouraged use of patient care services in violation of the Medicare Conditions of Participation set

forth in Title 42, Part 418, of the United States Code. By not producing such service, Defendant failed to provide the appropriate palliative measures required by Medicare. Defendant did so in ways including but not limited to the following:

a. Defendant failed to provide skilled nursing visits (physical therapy, occupational therapy, speech therapy) as required by Medicare, which resulted in sub-standard care. Defendant averaged less than .0018 therapist visits per day combined. In contrast, skilled nursing therapists nationwide average about 5.25 combined visits per day for hospice providers.

b. Defendant failed to provide sufficient management oversight which resulted in sub-standard care. When Defendant purchased a competitor named VistaCare in Spring 2008, VistaCare provided three Regional Clinical Managers ("RCM") per region. RCM's are responsible for clinical oversight of the facilities. They have direct supervision of the Continuous Quality Improvement Manager, who make sure audits are conducted, and oversee employee training, orientation, management functions, medical records and more.

50. Defendant terminated all of the RCMs that VistaCare had in place. Defendant instead provides one RCM for each *region* in the country. One RCM per region cannot provide the necessary minimum oversight. Regions can range in size from 10 to 20 facilities.

c. Defendant failed to provide sufficient Certified Nursing Assistant's (CNA's)/Home Health Aide (HHA) visits for patients on service in nursing homes as it did for those patients on service in their own homes/hospice facilities, resulting in sub-standard care. In order to reduce expense and maximize reimbursement, the Defendant relied on nursing home staff to provide the bulk of these services.

14

## Claims for Medically Unnecessary Services

51.     Defendant knowingly submitted claims for medically unnecessary services, including but not limited to under the following circumstances:

a.     False claims were submitted under a diagnosis of "Debility," or other "catch-all" diagnoses. The debility diagnosis (ICD-9-CM 799.3 Debility, Unspecified) for instance, was commonly and increasingly used within Defendant, as a catch-all for admissions, especially those without medical necessity.

b.     Defendant billed for patients of the Tucson, Arizona, program, although the Medical Director never approved the initial patient admission and the patients were discharged. Patients were not properly qualified and subsequently those who did not meet criteria were typically discharged within days of admission, but never formally and properly admitted with physician orders.

c.     From April 2007 to present, the Rhode Island facility submitted false claims for patients not eligible for hospices. The facility went from almost no growth to one of the top five producers for the Defendant. Their census went from 67 on March 20, 2007, to over 200 at present. During this period, 80% of their admissions came from nursing homes, which is by far the largest percentage of nursing home admits *from any program in the country*. Moreover, the Rhode Island facility had nursing homes with 25% or more of their patients on service with Defendant, *which is over 3 times the national average.*

## Additional Medicare Conditions of Participation Violations

52.     Defendant violated the Medicare Conditions of Participation, Title 42 Section 418.24(a), which requires the filing of an election statement. 25% of patients who elected service

15

with the Defendant did not actually sign or knowingly file an election statement, however, in these cases, a person holding a Power of Attorney (POA) for the patient signed on their behalf. Per Medicare guidelines, the POA may sign only when the individual is *physically or mentally incapacitated*. The hospice provider must document on the election form as to why the POA has signed and then witnessed, which Defendant failed to do under most circumstances.

### Intra-transfer to circumvent cap

53.    Defendant may have knowingly transferred patients from one of its hospices to another of its hospices in order to circumvent the reimbursement caps.

54.    Total annual payments to a hospice may not exceed a per-patient "cap" amount multiplied by the number of Medicare patients who received care from that hospice during the year. Thus, the hospice's overall cap amount is based on the total number of patients enrolled during the year times the individual cap amount. The cap amount is an attempt to keep the hospices from enrolling non-terminal patients (who live longer than the suggested "six months" standard longevity of a "terminally ill" patient).

55.    The VistaCare Philadelphia program, after the acquisition by Defendant, transferred their patients with the greatest amount of days to the Philadelphia Odyssey program during the period of July 2008 – September 2008 in order to minimize patient day averages in the VistaCare program, but increase the days at the Philadelphia program. At no time did Defendant close down the Philadelphia program, and *there was absolutely no legitimate reason for to transfer* of the frail, terminally ill patients. The Miami Odyssey location had a similar practice in 2006 and 2007 when it acquired cap patients from a competing hospice in order to rapidly increase revenue to the Miami Odyssey site. This was done under the direction of Defendant solely for the purpose of defrauding

16

Medicare. Relator believes that proper apportionment between the facilities was not calculated by the intermediary.

**Violations of Anti-Kickback Statute**

56.     Defendant violated the Anti-Kickback Statute by engaging in conduct which includes paying Medical Directors for referrals:

a.     Defendant contracts with medical doctors to serve as Medical Directors and Associate Medical Directors, but improperly selects and/or retains them based upon their ability to refer patients to the Defendant.

b.     All of the Medical Directors were required to participate in marketing initiatives, required to visit facilities and build relationships, and required to report their marketing efforts each quarter and also as part of every yearly evaluation.

c.     Medical Directors and Associate Medical Directors typically double their referrals to Odyssey once under contract.  The purpose of the payment by Defendant is to obtain referrals from the Medical Directors.

57.     Defendant violated the Anti-Kickback Statute by providing free patient care for select referring physicians.

a.     Defendant has an unwritten policy of taking on non-funded patients on a case by case basis. After receiving a request to bring a non-funded patient on service, the protocol was to call or email the Regional Vice President (RVP) and provide the following information: What the diagnosis is; what the prognosis is; what is the cost of any medications or equipment; who the referring physician is; how much business does the physician refer to Odyssey; and how much

17

business does Odyssey expect from the physician in the future.

      b.     The RVP then decides whether or not Odyssey is going to provide services for the patient based upon the answers to the questions. The purpose of providing free patient care is to reward and/or induce select physicians who refer or can refer a sufficient amount of patients to the Defendant.

## COUNT I
### False Claims Act 31 U.S.C. § 3729(a)(1) and (a)(2)

58.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 57 of this complaint.

59.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

60.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the United States Government false or fraudulent claims for the payment or approval of medical services.

61.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records or statements to cause a false or fraudulent claim to be paid or approved by the United States Government.

62.     By virtue of the acts described above, Defendant knowingly engaged in kickback schemes for the purpose of inducing, and did induce, the presentation of false or fraudulent claims to the United States Government for the payment of medical services as described above.

63.     The United States, unaware of the falsity of the records, statements or claims made

18

by the defendants or the kickbacks involved, paid the Defendant for claims that would otherwise not have been allowed.

64.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

WHEREFORE, Relator Bryan Dingus requests that judgment be entered against Defendant, ordering that:

a.      Defendant pays not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's actions;

c.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e.      The United States and Relator recover such other relief as the Court deems just and proper.

## COUNT II
## 31 U.S.C. § 3730(h) (FCA wrongful discharge)

65.     Relator repeats and realleges each allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

66.     Defendant has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an FCA action.

67.     Relator took lawful actions in furtherance of a False Claims Act action, including but not limited to investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

19

68.    In or about November 18, 2008, Defendant terminated Relator's employment.

69.    Relator was discriminated against in the terms and conditions of his employment by Defendant, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the False Claims Act.

70.    The actions of Defendant damaged and will continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

71.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against Defendant, as follows:

(a)    For all proper damages in favor of Relator as a result of Defendant's in violation of 31 U.S.C. § 3730(h), including reinstatement with the same seniority status that Relator would have but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of the discrimination including attorneys fees, costs and expenses.

(b)    Such other and further relief as this Court deems proper.

## COUNT III
### Virginia Fraud Against TaxPayers Act Wrongful Discharge

72.    Relator repeats and realleges each allegation contained in paragraphs 1 through 57, above as if fully set forth herein.

73.    Defendants have a duty under the Virginia Fraud Against Taxpayers Act § 8.01-216.8

20

to refrain from taking retaliatory actions against an employee because he has opposed any practice referenced in §8.01-216.8 or because has initiated, testified, assisted or participated in any manner in any investigation, action or hearing under Article 19.1 of the Code of Virginia.

74. Relator has opposed Defendant's violations of Section § 8.01-216.3, items A.1 and A.2 and, as such, engaged in protected activity under the Virginia Fraud Against Taxpayers Act and other laws.

75. In or about November 18, 2008, Defendant terminated Relator's employment. In violation of Virginia Fraud Against Taxpayers Act § 8.01-216.8, Defendant discharged the Relator because of lawful acts taken by the Relator that are protected by Virginia Fraud Against Taxpayers Act.

76. Relator was discriminated against in the terms and conditions of his employment by Defendant, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the Virginia Fraud Against Taxpayers Act.

77. The actions of Defendant damaged and will continue to damage Relator in violation of Virginia Fraud Against Taxpayers Act § 8.01-216.8, in an amount to be determined at trial.

78. Pursuant to Virginia Fraud Against Taxpayers Act § 8.01-216.8, Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against Defendant, for reinstatement with the same seniority status that Relator would have had but for the discrimination; and not less than two times the amount of back pay, interest on the back pay, and compensation for

any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury.

Dated this ___ day of March, 2009.

HEINS LAW OFFICE LLC
Counsel for the Plaintiff

_____
Janet L. Heins, State Bar No. 1000677
Martin C. Kuhn, State Bar No. 1055770
1001 West Glen Oaks Lane, Suite 108
Mequon, Wisconsin 53092
(262) 241-8444 voice
(262) 241-8455 facsimile
e-mail: jheins@bizwi.rr.com
mkuhn@bizwi.rr.com

Of Counsel:
Kenneth J. Nolan, Esq.
Marcella Auerbach, Esq.
Nolan & Auerbach, P.A.
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Telephone: (954) 779-3943
Fax: (954) 779-3937